UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLOBAL REINSURANCE CORPORATION—
U.S. BRANCH (formerly known as Gerling
Global Reinsurance Corporation—U.S. Branch)

                         Petitioner,

        -against-

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON, et al.,

                         Defendants.

06 Civ. 7689 (RJH)

**MEMORANDUM OPINION**

**AND ORDER**

---

       Petitioner Global Reinsurance Corporation—U.S. Branch ("Global") filed a Petition to Appoint an Umpire in connection with a demand for arbitration that respondent Certain Underwriters at Lloyd's, London, Excess Insurance Company, and Turegum Insurance Company (collectively, "London Reinsurers") served on Global on June 2, 2004.  Pursuant to a series of reinsurance agreements relating to the underwriting years 1970 through 1975, London Reinsurers agreed to reinsure Global.  Specifically, the parties entered into a First Layer Facultative and Treaty Casualty Excess of Loss Treaty for the period October 1, 1970 through December 31, 1975 and a Second Layer Facultative and Treaty Casualty Excess of Loss Treaty for the period January 1, 1973 through December 31, 1975 (collectively "Treaties").  Under the Treaties, the parties agreed to arbitrate all disputes or differences arising out of the interpretation of the Treaties.  (Walsh Aff. Ex. 1 & 2, Art. XV(a).)  The Treaties further provide for arbitration before a three-member panel consisting of two party-appointed arbitrators ("party-

arbitrators") and an umpire.  Global objects to London Reinsurers' nominee for umpire on the ground that the candidate has "no umpire experience and [has] pre-existing ties to London Reinsurers and their counsel."  (Pet. ¶ 15.)  Global now requests that the Court appoint Global's nominee as umpire in the arbitration between the parties and award Global its costs and attorneys' fees incurred in this action.  For the reasons set forth below, Global's Petition [1] is denied.

## BACKGROUND

The two Treaties at issue in this case contain identical arbitration provisions that explicitly detail the manner in which the arbitration panel shall be selected.  The Treaties provide:

> Arbitration shall be initiated by either the Company or the Reinsurer (the petitioner) demanding arbitration and naming its arbitrator.  The other party (the respondent) shall then have thirty (30) days, after receiving demand in writing from the petitioner, within which to designate its arbitrator.  In case the respondent fails to designate its arbitrator within the time stated above, the petitioner is expressly authorized and empowered to name the second arbitrator, and the respondent shall not be deemed aggrieved thereby.  The arbitrators shall designate an umpire within thirty (30) days after both arbitrators have been named.  In the event the two (2) arbitrators do not agree within thirty (30) days on the selection of an umpire, each shall nominate one (1) umpire.  Within thirty (30) days thereafter, the selection shall be made by drawing lots.

(Walsh Aff. Ex. 1 & 2, Art. XV(c).)  The Treaties also provide that the arbitrators and umpire "shall be active or retired officers of Insurance or Reinsurance Companies."  (*Id.*, Art. XV(a).)  In accordance with the arbitration clauses, each side designated its party-arbitrators.  London Reinsurers appointed Klaus H. Kunze, and Global appointed Janet J. Burak.  Initially, the party-arbitrators attempted to agree upon an umpire, but when that process proved unsuccessful, on or about November 2005, Global nominated James P. White as its umpire nominee and London Reinsurers nominated Paul C. Thomson III.

In early December 2005, Global suggested that Thomson may have a conflict on account of his serving as a panel member in an arbitration between Global and another of its reinsurers involving the same Treaties. (Scully Aff. ¶ 5.) London Reinsurers claimed that it was unaware of the conflict and requested confirmation, which Global provided on January 20, 2006. (Scully Aff. Ex. 3.) On February 1, 2006, London Reinsurers replaced Thomson by nominating Stephen J. Lewis and suggested that the parties forward umpire questionnaires to the candidates. (Scully Aff. Ex. 4.) About two weeks later, Global requested Lewis's curriculum vitae, which London Reinsurers provided on February 17, 2006.

Global did not contact London Reinsurers again concerning the umpire selection process until August 21, 2006, at which time Global sent a letter with its Counter-Demand for arbitration. (Scully Aff. ¶ 11 and Ex. 7.) The letter also suggested that the parties continue with the umpire selection process by forwarding questionnaires to the candidates, which the parties did on August 25, 2006. (Scully Aff. Ex. 7, 8 and 9.) Significantly, Global's letter raised no objection to Lewis's nomination, nor did it claim that the umpire selection process had broken down. (Scully Aff. Ex. 7.)

Lewis returned his completed umpire questionnaire on September 12, 2006, and White returned his questionnaire on September 13, 2006. (Scully Aff. Ex. 10 and 11.) On September 19, 2006, Global lodged its first objection to London Reinsurers' nomination of Lewis. Global claimed—as its claims in the instant lawsuit—that Lewis is conflicted because: (1) "he previously was employed by Unionamerica, one of the co-reinsurers on the [Treaties] although not a party to the instant arbitration"; (2) "he has acted as a consultant and expert witness for various syndicates in the Lloyd's Market and

Certain Underwriters of Lloyd's"; (3) he was "also appointed by London Reinsurers' original counsel, Lord Bissell & Brook, as arbitrator and acted as an arbitrator in an arbitration involving Turegum."[1]  (*See* Pet. ¶ 11; Scully Aff. Ex. 12; Walsh Ex. 6.)  Global further claims that Lewis has insufficient experience to handle "an arbitration of this size and scope" because he "has absolutely no umpire experience and his sole arbitration experience, which consists of two appearances as an arbitrator, seem to be as a result of his relationship with Turegum and London Reinsurers' counsel, Lord Bissell & Brook." (Scully Aff. Ex. 12; Walsh Ex. 6.)  By letter dated September 22, 2006, London Reinsurers attempted to refute Global's claims and proposed that the parties proceed with the umpire selection process by drawing of lots on September 25, 2006.  (Scully Aff. Ex. 13.)  Global spurned this request, however, and filed its Petition with this Court on September 25, 2006, just six days after voicing its objections to Lewis's nomination.  (*Id.* Ex. 14.)  Global has asked the Court to find that the parties' inability to agree upon an umpire is a "lapse" within the meaning of the Federal Arbitration Act and has also asked the Court to enter an order appointing Global's nominee, James P. White, as umpire.

**DISCUSSION**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., provides that if an arbitration agreement contains a provision "for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method *shall* be followed."  9 U.S.C. § 5 (emphasis added).  But,

> if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason

---

[1] Harper Insurance Limited (formerly known as Turegum Insurance Company) and Global have resolved their dispute, and thus Harper is no longer a party to the underlying arbitration (although Harper has not yet been dismissed from this lawsuit).  (Opp. 2.)

4

> there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein . . . .

*Id.* The Second Circuit has interpreted the term "lapse" to mean "a lapse in time in the naming of the arbitrator or in the filling of a vacancy on a panel of arbitrators, or some other mechanical breakdown in the arbitrator selection process." *In re Salomon Inc. Shareholders' Derivative Litigation*, 68 F.3d 554, 560 (2d Cir. 1995) (internal citation and quotation marks omitted). A district court has the authority under § 5 to select an umpire if there is a "lapse" in the naming of an umpire "and the arbitration agreement in question does not provide a mechanism for filling the void." *AIG Global Trade & Political Risk Ins. Co. v. Odyssey Am. Reinsurance Corp.*, No. 05 Civ. 9152 (DC), 2006 U.S. Dist. LEXIS 73258, at *16 (S.D.N.Y. Sept. 21, 2006); *see also Mut. Marine Office, Inc. v. Ins. Corp. of Ir.*, No. 04 Civ. 8952 (PKL), 2005 U.S. Dist. LEXIS 11584, 2005 WL 1398597, at *3 (S.D.N.Y. June 13, 2005) (denying petition to appoint umpire because respondent's nominees for umpire satisfied the arbitration agreement's minimum qualifications for umpire, and, under 9 U.S.C. § 5, "courts must focus on the agreed upon terms of the arbitration provision when confronted with an arbitration related dispute"); *Astra Footwear Indus. v. Harwyn Int'l, Inc.*, 442 F. Supp. 907, 910 (S.D.N.Y. 1978) (finding that "9 U.S.C. § 5 was drafted to provide a solution to the problem caused when the arbitrator selected by the parties cannot or will not perform").

The mere six days between the time Global notified London Reinsurers of its objections to Lewis and the time it filed the instant Petition cannot be characterized properly as a "lapse" that justifies judicial intervention. Although Global attempts to

5

characterize the entire period between November 2005 and September 2006 as a lapse within the meaning of 9 U.S.C. § 5, during this period the umpire selection process was moving forward, albeit slowly, in accordance with Article XV(c) of the Treaties. *See Travelers Indem. Co. v. Gerling Global Reinsurance Corp.*, No. 99 Civ. 4413 (LMM), 2001 U.S. Dist. LEXIS 6684, 2001 WL 546600, at *2 (S.D.N.Y. May 23, 2001) (finding no lapse where parties were engaged in "amicable" discussions regarding discrepancies between various reinsurance agreements and motion practice regarding the disqualification of counsel).[2]  Moreover, to the extent there is a lapse in the process, Article XV(c) of the Treaties provides the mechanism for filling the void:  Once each party has nominated one umpire, "the selection shall be made by drawing lots."  (Walsh Aff. Ex. 1 & 2, Art. XV(c).)

Global attempts to argue that London Reinsurers' nomination of Lewis demonstrates "that London Reinsurers are merely gaming the system by nominating patently unqualified candidates as a means of delaying the arbitration" (Global Reply 4) and "that they have no interest in participating in the umpire selection process in good faith" (Global Mem. 6).  However, London Reinsurers has indicated that it is prepared to proceed with the selection method agreed to by the parties by drawing lots.  (Scully Aff. Ex. 13.)  Global's argument that there is a lapse that justifies the district court selecting an umpire thus appears to be an end-run around well-established Second Circuit precedent prohibiting courts from "entertain[ing] an attack upon the qualifications or partiality of arbitrators until after the conclusion of the arbitration and the rendition of an

---

[2] For the reasons noted in footnote nine of London Reinsurers' opposition papers, the cases cited by Global do not support its position that the Court has the authority in this case to appoint the umpire.

award." *See Availl, Inc. v. Ryder Systems, Inc.*, 110 F.3d 892, 895 (2d Cir. 1997) (quoting *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 n.4 (2d Cir. 1980)); see also *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 174 (2d Cir. 1984) ("The Arbitration Act does not provide for judicial scrutiny of an arbitrator's qualifications to serve, other than in a proceeding to confirm or vacate an award, which necessarily occurs after the arbitrator has rendered his service."); *Travelers Indem. Co.*, 2001 U.S. Dist. LEXIS 6684, 2001 WL 546600, at *2 ("Challenging the neutrality of an arbitrator, and by logical extension a candidate to serve as an arbitrator, is only proper after an arbitration award has been entered."). If Global wishes to challenge the qualifications or neutrality of the selected umpire, or any candidate nominated to serve as an umpire, it may do so only after an arbitration award has been entered by the three-person arbitration panel. *See id.*[3]

"When faced with an arbitration clause, courts must attempt to implement that clause as written." *RLI Ins. Co. v. Kansa Reinsurance Co.*, No. 91 Civ. 4319 (MBM), 1991 U.S. Dist. LEXIS 16388, 1991 WL 243425, at *4 (S.D.N.Y. Nov. 14, 1991); *see also* 9 U.S.C. § 5 ("If in the agreement provision be made for a method of naming or appointing . . . an umpire, such method shall be followed . . . ."); *Pacific Reinsurance*

---

[3] In framing any future challenge to the impartiality of the umpire, Global should consider the Second Circuit's observation regarding "the competing interests inherent in the use of arbitration." *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 83 (2d Cir. 1984). The court noted

> the competing interests inherent in the use of arbitration. On the one hand, parties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute. Familiarity with a discipline often comes at the expense of complete impartiality.

*Id.* "Therefore, disqualifying an arbitrator because he or she had prior professional dealings with one of the parties would make it difficult at best, to find a qualified arbitrator at all." *National Union Fire Ins. Co. v. Holt Cargo Sys.*, No. 99 Civ. 3699 (RCC), 2000 U.S. Dist. LEXIS 3956, 2000 WL 328802, at *3 (S.D.N.Y. Mar. 28, 2000).

*Management Corp. v. Ohio Reinsurance Corp.*, 814 F.2d 1324, 1329 (9th Cir. 1987). Because the next step in the umpire selection process is clear under the Treaties, there has been no lapse in the process and the Court is without authority to appoint an umpire.

## CONCLUSION

For the reasons set forth above, the Court denies the Petition [1] and denies both Petitioner's and Respondent's motions for attorneys' fees and costs. As stated on the record at the hearing on December 15, 2006, the Court orders the parties to proceed to the next step in the umpire selection process by drawing lots. The Court will retain jurisdiction of this case only until such time as an umpire is selected.

SO ORDERED.

Dated: New York, New York
December 16, 2006

Richard J. Holwell
United States District Judge

8